# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL SIEGEL and REBECCA SIEGEL, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 06 C 0035 |
| SHELL OIL COMPANY, a Delaware corporation,  BP CORPORATION NORTH AMERICA, INC., an Indiana corporation, CITGO PETROLEUM CORPORATION, a Delaware corporation, MARATHON OIL COMPANY, an Ohio corporation, and EXXON MOBIL CORPORATION, a New Jersey  corporation, | ) ) ) ) ) ) ) ) | Judge Amy St. Eve    Magistrate Martin C. Ashman |
| Defendants. | ) ) ) | |

## AMENDED CLASS ACTION COMPLAINT

NOW COME Plaintiffs, MICHAEL SIEGEL and REBECCA SIEGEL, on behalf of themselves and all others similarly situated, by and through their attorneys, LARRY D. DRURY, LTD. and WILLIAM J. HARTE, LTD., and for this Class Action Complaint against Defendants, allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

1.    Defendants possess oligopolistic power and have possessed oligopolistic power throughout the entire class period, i.e., 2000 to the date of judgment, in the crude, refined and gasoline industry ("gas industry"), and have used this power in concert with their co-conspirators to illegally and artificially restrain trade and increase the price of gasoline to consumers by controlling their inventory, production, exports, limiting supply, restricting purchase, zone

pricing, falsely advertising the scarceness of gasoline and excessive mark up between gasoline and crude prices, as discussed in the Article "Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by the Katrina Boom," at pp. 5-7, September 16, 2005, by Donald A. Nichols, Professor of Economics and Public Affairs at the University of Wisconsin and Director of The La Follette School of Public Affairs, and Co-Director for World Affairs and the Global Economy.  An oligopoly is defined as a market condition in which sellers are so few that the actions of any one of them will materially affect price and have a measurable impact on competitors.   In fact, in 2002, the attorney for Tosco Corp. (now Phillips Petroleum),  Maxwell Blecher,  in his opening statement on behalf of refiners in the west during the State of Hawaii's antitrust suit, stated, "Once you decide it's an oligopoly, you've got an explanation for the phenomenon of the high prices, the high margins, the high profits, the lack of vigorous price competition.  That explains it all."

2.      The Defendants' aforesaid actions have caused both the price and demand for gasoline to remain artificially high and supply artificially low throughout the Class Period and thus have caused gas purchasers to incur artificially high gasoline prices and actual damages.

3.      For example, Defendant SHELL OIL COMPANY ("Shell") not only decreased the production at its Bakersfield California refinery during peak usage periods, and, during the class period, produced far less than the site's capacity, but also, it announced its plans to close the site despite the Bakersfield refinery achieving world-class performance two years in a row and having the largest profits per gallon of any Shell refinery in the nation, thereby manipulating the market into shortages to drive up the price of gasoline.  Amid protests that the closure was intended to pump up gasoline prices by decreasing supply, the California attorney general

effectively forced Shell to find a buyer for the refinery (which is in use today).  Shell employees

have reportedly claimed that Shell lied and led people to believe that it limited refinery

production or sought to close the refinery due to inadequate supply of crude oil, and internal

Shell documents reportedly show that operations at the refinery were running well and that Shell

was capitalizing on very high profit margins.

4.      Likewise, Defendant BP CORPORATION NORTH AMERICA INC. ("BP")

shut down half of the nation's largest oil field/pipeline in August 2006 possibly for months, in

Prudhoe Bay, Alaska, after  an inspection detected a small pipeline leak.  BP operates the oil

field, which accounts for 8 percent of U.S. oil output, for itself and other gasoline providers

including Defendant EXXON MOBIL CORPORATION.  The shut-down only further increased

gasoline prices, while at the same time boosting BP's and the Defendants' already record profits,

according to Judy Dugan, research director at the Foundation for Taxpayer and Consumer Rights.

The pipeline shut-down was preventable, in that BP knowingly allowed the pipeline to corrode

and leak, rather than reinvest part of its record profits in adequate maintenance.  In fact keeping

the pipeline clean costs very little, and BP has acknowledged it didn't do enough to prevent its

Prudhoe Bay pipelines from corroding.  The U.S. Department of Transportation has reported that

it has not received a reasonable explanation of why BP had not cleaned the pipeline in years,

noting that another Alaskan pipeline is cleaned every two weeks.  In fact, as reported at least on

MSNBC.com, several present and former BP employees have reportedly claimed they were told

to cut back on maintenance of the pipeline and falsify records regarding same, and the issue is

under criminal investigation.

5.      It is clear that the alleged artificially inflated gasoline prices during the

class period are intended by the Defendants and their co-conspirators.  By monitoring the crude sales and published reports of the volume of crude going into each refinery, Defendants can gauge the current level of production.  Since said Defendants share common storage tanks and pipeline schedules, each refiner can quickly determine the movement of gasoline, level of importing or exporting, and existing inventory levels.

6.      Intentional cutbacks in production, diversion of expected imports to another region, or a decision to increase exports are all factors found to affect the volume of gasoline flowing into the Defendants' shared tanks and, thereby, resulting in price spikes and exorbitant, unconscionable, unjust and lawful prices at the pump, all to the unjust enrichment and profit of the Defendants and to the damage and detriment of Plaintiffs and the Class.

7.      Accordingly, this class action is brought on behalf of gasoline purchasers throughout Illinois and the United States from the year 2000 to the date of judgment to recover damages for violations of the Illinois Consumer Fraud and Deceptive Business Practice Act, the Illinois Uniform Deceptive Trade Practices Act, the like and similar statutes throughout the United States, for Unjust Enrichment, and for Civil Conspiracy.

<u>JURISDICTION AND VENUE</u>

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2).

9.      The Court has jurisdiction over the Defendants in that Defendants either maintain their principal place of business within Illinois, are registered to do business in Illinois, or conduct substantial business within Illinois, and acts or conduct giving rise to the cause of action stated herein occurred in the State of Illinois.

10.      Venue is proper in this Court.  For example, pursuant to 28 U.S.C. §1391(a)(2),

a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>THE PARTIES</u>

11.      Plaintiffs are citizens of Illinois and residents of Cook County, Illinois, who purchased gasoline from the various Defendants for end use, and not for resale, during the class period.

12.      SHELL OIL COMPANY ("SHELL") is a Delaware corporation, selling, marketing, advertising and distributing gasoline to consumers in the State of Illinois and the United States.  Shell reported earnings of $7.32 billion in the second quarter of 2006, up 40 percent from the previous year.

13.      BP CORPORATION NORTH AMERICA, INC. ("BP") is an Indiana corporation, selling, marketing, advertising and distributing gasoline to consumers in the State of Illinois and the United States.  BP recorded a 30 percent increase in profits to $7.3 billion in the second quarter of 2006 compared to the second quarter 2005.  BP P.L.C., BP's parent company, was created in 1998 as a result of the merger of Amoco Corp. and the British Petroleum Oil Company, P.L.C.

14.      MARATHON OIL COMPANY ("MARATHON") is an Ohio corporation, selling, marketing, advertising and distributing gasoline to consumers in the state of Illinois and others in the United States.  Marathon's second quarter 2006 profits more than doubled due to strong gasoline prices and sharply higher (almost double) refining margins, and as a result Marathon stock shares reached an all-time high, far exceeding industry analyst forecasts.

15.     EXXON MOBIL CORPORATION, ("EXXON") is a New Jersey corporation, selling, marketing, advertising and distributing gasoline to consumers in the State of Illinois and the United States.  Exxon's second quarter 2006 profits increased 36 percent to $10.36 billion, the second largest quarterly profit ever for a publicly traded company.

16.     CITGO PETROLEUM CORPORATION ("CITGO") is a Delaware corporation, selling, marketing, advertising and distributing gasoline to consumers in the States of Illinois and the United States with 14,000 gas stations and eight refineries nationwide.  CITGO receives crude oil for its gasoline refining operations at a very attractive, subsidized price from its wholly-owned, state-run parent company, Petroleos de Venezuela, which sells crude oil on the world market and uses Citgo to distribute it.

17.     Owners and operators of each of the Defendants' gas stations, by virtue of their agreements with the respective Defendants, are required to sell only the respective Defendants' gasoline at the price or price range dictated by each Defendant, and to post signs bearing the respective Defendants' name and logo.

18.     Defendants' gasoline is marketed, sold or distributed by the Defendants through their agents (including their gas stations), employees, dealers, distributors, brokers, affiliates or subsidiaries in the United States.

19.     Various other corporations, organizations, firms and individuals, not made defendants in this Complaint, participated as co-conspirators in the violations alleged herein, and performed acts and made statements in furtherance thereof.

<u>GENERAL ALLEGATIONS</u>

20.     Defendants' oligopoly dominates the market for gasoline in the United States,

controlling a substantial portion of the nation's gasoline supply.

21.     In 2005 alone, Defendants sold billions of dollars worth of gasoline and used their market dominance to create constant increases and decreases in production resulting in price spikes and "just in time inventories".  Further, as a result of price increases there is a dramatic increase in state and local sales tax collected, and interest and late charges on credit cards used by the Plaintiffs and the Class to purchase gasoline from the Defendants and each of them.

22.     Defendants also utilized their oligopolistic power to tread on national emergencies, using such events as Hurricane Katrina to artificially and unjustly raise prices. During recent Congressional hearings into those Defendants' conduct, and the likelihood of their price gouging, one of the key industry executives, in effect, admitted that the industry had the power, and did exercise that power, to dramatically increase prices.  His excuse for doing so was that the industry was trying to preserve supply for the American public.  Defendants knew or should have known that such pricing would not significantly reduce demand and the conduct was designed to reap profits that amount to gouging the public.

23.     During the class period, including presently, Defendants have used their oligopoly, *inter alia*, to illegally and artificially restrain trade and increase the price of gasoline to the consumer by controlling their inventory, production, exports, limiting supply, restricting purchase, zone pricing, falsely advertising the scarceness of gasoline and excessive mark up between gasoline and crude prices (as discussed in the Article, "Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by the Katrina Boom," pp. 5-7, Donald A. Nichols, September 16, 2005).

24.     The gas industry has earned more than 25 billion dollars in profits in the July -

September quarter of 2005 as the price of crude oil hit $70.00 a barrel and gasoline surged to

record levels after the disruption of Hurricanes Katrina and Rita.  Outrageously, in the aftermath

of an American disaster, Defendants utilized the tragedy to grossly and unjustly increase their

profits at the expense of the consuming public.  On November 2, 2005, former Energy Secretary,

Bill Richardson, was interviewed by Bill O'Reilly on *The O'Reilly Factor*.  Secretary Richardson

stated, in part, as follows:

O'REILLY:  "All right, you wrote a letter along with seven other governors asking President Bush and Congress to investigate price gouging.  Do you think that major oil companies priced gouged the American public?"

RICHARDSON:  "I do believe so, Bill.  There's no correlation right now between $3 at the gasoline pump and the price per barrel in the international market.  If it were $3, which it is now or close to it, it should be $90 per barrel on the international market and it's $65.  So the economics don't work."

"I do believe that there's price gouging.  I believe the Congress and the administration need to investigate.  And you heard what Exxon said, they certified their profits at $9 billion in the first quarter.  And then they said concurrently we're not going to invest in renewable energy and new refining capacity.  We're an oil and gas business.  And we're going to put that money in foreign exploration.  In other words, more foreign exploration, more dependence in Saudi Arabia in other countries.  But I think there's definitely price gouging.

O'REILLY:  "OK.  Now, Cavuto and a lot of the other analysts who stick up for the oil companies say look, it's free market.  It's supply and demand.  And I reply it's not a free market.  The mergers and the cabal that you have to deal with in OPEC and in the American oil companies mean it isn't free competition. Who's right as a former energy secretary?  Am I right or is Cavuto right?"

RICHARDSON:  "Well, you're right.  You're totally right because what happens is the Exxons of the words work very closely with Saudi Arabic, with OPEC.  They talk about increasing production, decreasing production.  They're all tied in together.  And I'm not saying necessarily the market isn't affecting prices, but the degree of increases is economically not justifying what is happening at the pump and what is happening in the international market.

<u>So there is price gouging</u>."

(Emphasis added).

25.     The constant increasing or decreasing of production by the Defendants and their

co-conspirators at their local refineries has the greatest impact on prices at the pump.  The level

of the Defendants' gasoline inventories in storage tanks is kept as low as possible to maximize

price, but just high enough to avoid the return of gas lines if an unexpected disruption of flow

into storage draws the inventory down.  "Just in time inventories" is the industry terminology for

today's practice of maintaining low levels of inventory.

26.     Plaintiffs also believe that the demand for gasoline does not exceed the supply

possessed or maintained by the Defendants in an amount which would justify Defendants'

gasoline prices.

27.     Gasoline prices are a function of factors such as the price of crude

oil, the prices of refineries who convert crude oil to gasoline, distribution, and taxes.  The portion

of gas prices tied to oil refining and distribution – which the Defendants control independently of

the market price of crude oil – has ballooned during the class period, as intended by the

Defendants, irrespective of the price of crude oil or other costs, or Hurricane Katrina or other

emergencies.

28.     In a free market, there is no explanation as to why the portion of the price of

gas attributable for costs and profits for refining and distribution nearly *tripled*, for example, in

2005 following Hurricane Katrina, and in the ensuing months thereafter, according to Professor

Donald A. Nichols.

29.     According to the Energy Information Administration, in the year 2004, 47 percent

of what consumers paid for a gallon of gasoline is for the price of crude oil, federal taxes is 23

percent, and of the remaining 30 percent, 12 percent is for distribution and 18 percent is for

refining costs and profits.  Gasoline prices exceeding $3.00 per gallon since 2005 have far

exceeded the historic 80 to 90 cent mark-up between crude oil costs and gasoline prices, and

Defendants' refineries' earnings tripled in the year between September 2004 and September

2005, according to Professor Nichols.

     30.    According to Professor Nichols, gasoline selling for $3.00 a gallon should be

expected to account for normal refining and distribution costs of 43 cents per gallon, taxes of 42

cents per gallon, and crude oil costs of 95 dollars per barrel, but in fact crude oil prices have

never come close to 95 dollars per barrel.  Rather, the formula cost components for the price of

gasoline have been altered by the each of the Defendants' oligopolistic practices which are aimed

at exponentially increasing their own profits, e.g., gasoline at $3.00 per gallon, less refining and

distribution costs of $0.43 per gallon equals $2.57 per gallon, less taxes of $0.42 per gallon

equals $2.15 per gallon of crude oil, multiplied by 44 gallons of crude oil per barrel equals

$94.60 crude oil per barrel.

     31.    The Defendants used Hurricane Katrina as a false pretext for boosting prices at the

pumps and their own profits, which they subsequently lowered, after the emergency, at a

deliberately and artificially slow pace in order to pocket yet more profits.  In the wake of

Hurricane Katrina, for example, Defendant EXXON reported a second quarter 2005 profit

increase of a significant 32 percent.

     32.    Using increases such as the price of crude oil and Hurricane Katrina as a

pretext, the Defendants have periodically caused the price of gasoline to increase dramatically

but also to artificially drop back down much more slowly (i.e., in the aftermath of Katrina or when the price of crude drops), in order to pocket additional profits.

33.     In a competitive market, when raw material such as crude oil becomes more expensive, profit margins typically shrink.  Despite the increases in the price of crude oil since Hurricane Katrina, however, the Defendants have recorded record profits in their refining operations.  In fact, since 1999 the average margin of refinery charges has increased by 85 percent, according to the Associated Press's analysis of data from the New York Mercantile Exchange.  In the seven preceding years, however, that margin increased by just 20 percent.

34.     Profits for the Defendant oil refiners have been at record highs.  In 1999, U.S. oil refiners made 22.8 cents per gallon of gasoline refined from crude oil.  By 2004, they were making 40.8 cents for every gallon refined, a 79% jump, and soared even higher to 99 cents on each gallon sold in 2005, according to the testimony of Tyson Slocum, Director of Public Citizen's Energy Program before the U.S. Senate Committee on the Judiciary.

35.     In early July 2006, crude oil prices increased to a record above $75 a barrel. Yet, the Defendants remained true to form and used the market increase in crude oil as an excuse to radically and disproportionally increase the price of refined gasoline and their own profits from refining crude into gasoline.  For the week inclusive of July 28, 2006, refiners' (including Defendants') gross profit margins hovered around $21 a barrel, similar to the refiner mark-ups after Hurricane Katrina, but compared with about only $12 a barrel before Katrina a year ago, according to information compiled by Bryant Gimlin, an analyst with Gray Oil Co.  Reportedly, during this recent time period the national average of gasoline prices would have been about $2.60 per gallon, if the refiners' gross profit margin had remained at the same from a year ago,

instead of average prices of $3.00 or more per gallon, according to Grimlin's figures.

36.    According to the National Association of Convenience Stores, when the price of gas increases the retail gross margins fall, so that it is not in gas station owners' best interests to increase gasoline prices in significant proportions, but rather, primarily in the interests of the Defendants to do so.

37.    The Defendants, together with other oil companies in the summer of 2006 caused to be published (or slated for publication) advertisements in 14 major national newspapers insisting oil companies' earnings are not exorbitant in light of crude oil prices. Thus, the Defendants continue to deny and in fact conceal their control of prices, their exponential profit increases, and their conspiracy to maintain artificially high gasoline prices.

38.    Defendants, by and through their officers and directors, in the United States and throughout the class period, combined and conspired to proceed with and implement their deceptive and unfair practices as alleged herein.

CLASS ALLEGATIONS

39.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of gasoline purchasers throughout Illinois and the United States from the year 2000 to the date of judgment to recover damages for violations of the Illinois Consumer Fraud and Deceptive Business Practice Act and the Illinois Uniform Deceptive Trade Practices Act, similar state statutes, for Unjust Enrichment, and for Civil Conspiracy.

40.    Excluded from the Class are Defendants' officers, directors, agents, and employees.  Also excluded is any judge who may preside over this case.

41.    Plaintiffs are members of the Class and will fairly and adequately assert and

protect the interests of the Class.

42.     Plaintiffs' interests coincide with and are not antagonistic to those of other members of the Class.

43.     Plaintiffs have retained attorneys who are highly experienced in class action litigation.

44.     Members of the class are so numerous and geographically dispersed that joinder of all Class Members is impracticable.  There are millions of Class Members and numerosity is readily met.

45.     There are questions of law or fact common to the Class, which common questions predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to, the following:

A.      whether Defendants combined or conspired with others to fix, raise, stabilize, and maintain the prices of gasoline;

B.      whether Defendants oligopolized or combined or conspired with others to oligopolize the supply of gasoline;

C.      whether Defendants' conduct caused the price of gasoline to be maintained at levels higher than would exist in a competitive market; and

D.      whether Defendants' conduct caused injury to Plaintiffs and the Class and, if so, the appropriate class-wide measure of damage.

46.     The prosecution of separate actions by individual members of the Class would create a risk of:

A.      inconsistent or varying adjudications with respect to individual members of the

Class, and/or

B.      adjudication with respect to individual members of the Class, which would, as a

practical matter, be dispositive of the interests of other members not parties to the

adjudication or substantially impair or impede their ability to protest their interest.

47.      The class action method is appropriate for the fair and efficient prosecution of this

action.

48.      Individual litigation of all claims, which might be brought by all Class members,

would produce a multiplicity of cases so that the judicial system would be congested for years.

Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid

conclusion to all litigation of all claims arising from the conduct of Defendants.

## COUNT I

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS  PRACTICES ACT

### (Deceptive Practices)

49.      Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through

48 as if fully set forth herein.

50.      This Count is brought pursuant to the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 ILCS 505/1, et seq., and the Uniform Deceptive Trade

Practices Act, 815 ILCS §510/2, on behalf of all people who purchased Defendants' gasoline at

retail in the State of Illinois, or alternatively under the consumer fraud and deceptive business

practice statutes of the various states on behalf of all people who purchased gasoline at retail in

the various states where purchases of Defendants' gasoline were made, during the class period.

51.      At all times relevant time hereto, Plaintiffs, the Class and Defendants were all

-14-

persons within the meaning of 815 ILCS 505/1( c ).

52.     At all relevant times hereto, Plaintiffs and Class members were consumers within the meaning of 815 ILCS 505/1(e).

53.     At all times material hereto, Defendants acts and omissions occurred in the course of  trade and commerce within the meaning of 815 ILCS 505/1(f).

54.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et. seq., provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 6, 1965, in conduct of any trade or commerce are hereby declared unlawful, whether any person has in fact been mislead, deceived or damaged thereby.

55.     Beginning the first date that Defendants placed their gasoline into the stream of commerce and continuing through the present, Defendants, individually and in concert, by and through their employees, agents, distributors, dealers, brokers and/or shared tanks and pipelines, engaged in misrepresentations, unlawful schemes and courses of conduct as stated in paragraphs 1-7, 11-38 above that induced Plaintiffs and the Class to purchase gasoline through one or more of the following unfair and/or deceptive acts and/or practices:

> illegally and artificially restraining trade and increasing the price of gasoline to consumers by controlling inventory, production, exports, limiting supply, restricting purchase, zone pricing, deceitful pricing, falsely advertising the scarceness of gasoline and excessive mark up between gasoline and crude prices (as discussed in the Article "Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by the Katrina Boom," pp. 5-7, Donald A. Nichols, September 16, 2005).

56.     Throughout the class period, and for the time period inclusive of and in the

months following Hurricane Katrina, and also between August 2005-August 2006, Plaintiffs

periodically purchased several gallons of gasoline in each of the Defendants' Chicago area gas

stations, at the artificially inflated prices advertised by the Defendants at the pumps and store

signs of said gas stations.  Each of the Defendants caused those gasoline prices to be listed and

gasoline to be provided for sale to Plaintiffs at each of their agent's respective gas stations, i.e., at

BP, Citgo, Marathon, Exxon and Shell stations.

57.    For example, Plaintiffs purchased numerous gallons of gasoline from Shell

gas stations located at 1301 Halfday, Deerfield, Illinois, and 10 Skokie Highway, Highland Park,

Illinois, in several visits during June-July 2006 (e.g., for Skokie Highway station, $3.239/gal. on

6/30/06, $3.419/gal. on 7/14/06, and $3.499/gal. on 7/29/06; for Halfday Rd. station, $3.319/gal.

on 7/1/06).

58.    Throughout the class period, and including between August 2005 and August

2006, each of the Defendants have, individually and in concert, uniformly promoted their prices

at the pumps, and on store signs mounted to attract on-coming traffic, of their gas stations

frequented by Plaintiffs and their other gas-paying customers (the Class), and have proximately

caused their gasoline to be sold to Plaintiffs and the Class at the prices listed and advertised at the

pump and on gas station signs, and at the prices promoted and as confirmed in Plaintiffs' and the

Class members' gasoline purchase receipts.

59.    The Defendants, at the time they advertised their gasoline prices and

Plaintiffs and the Class purchased the Defendants' gasoline at the pump, i.e., since the year 2000,

and inclusive of the time during Hurricane Katrina and the months thereafter and of the second

quarter of 2006 when gasoline prices in Illinois and nationwide exceeded $3.00 per gallon,

concealed and failed to disclose the following facts to Plaintiffs and the Class:

a.      that the per gallon gasoline price is not a free market price but rather is
artificially controlled by the Defendants, in order to boost retail market
prices of gasoline (*see, e.g.,* ¶¶ 1-6, 23-26, 31-32, *supra*);

b.      that the Defendants were not in compliance with applicable laws and
regulations governing the price of gasoline (*see, e.g.,* ¶¶ 60-63, *infra*);

c.      that the Defendants' profits for portions of the class period, including, for
example, during the time period between September 2004 and August
2006, far exceeded the range of profits including refiner profits that were
standard within the industry for decades; and

d.      that the per gallon gasoline price for portions of the class period,
including, for example, for time periods between September 2004 and
August 2006, far exceeded the norm in proportion to the price of crude oil.

60.     Illinois consumer protection regulations implementing the Illinois Consumer
Fraud and Deceptive Business Practices Act set forth standards and reasonable expectations for
the price of gasoline, and consider unconscionable gasoline high prices during market
emergencies such as an act of war or natural disaster to be an unfair or deceptive practice.  Ill.
Adm. Code. 14B II. §§ 465.10, 465.20.

61.     Said regulations define a gasoline price as unconscionably high, if "the
amount charged represents a gross disparity between the price of the petroleum product" and "the
price at which the same product was sold or offered for sale...immediately prior to the onset of
the market emergency," and if "the disparity is not substantially attributable to increased
prices...or increased costs due to an abnormal market disruption."  Ill. Adm. Code. 14B II. §
465.30.

62.     Similar statutes or regulations promulgating consumer protection statutes in

several Illinois sister states consider unconscionable gasoline high prices during market

emergencies such as an act of war or natural disaster to be an unfair or deceptive practice.[1]

63.     In the wake of Hurricane Katrina, as set forth above the Defendants caused

gasoline prices to dramatically increase in grossly disparate proportions compared to the price of

gasoline immediately prior to the onset of Hurricane Katrina or the resulting increase in the price

of crude oil.  The reason for said increase was not "substantially attributable to increased

prices...or increased costs due to an abnormal market disruption," but rather, was a result of the

Defendants' deceptive practice of using the Hurricane and related crude oil market conditions as

an excuse to exponentially boost their own profits, above and well beyond increased costs due to

the Hurricane and the market conditions – which the Defendants perpetrated individually and in

combination.

64.     Defendants' deceptive acts and/or practices, as alleged herein and above, were

material to Plaintiffs' and Class Members' decisions about whether to purchase gas.  Plaintiffs

and the Class Members would not have purchased Defendants' gasoline at the manipulated

prices, but for Defendants' deceptive acts and/or practices, but rather at the lower market prices

which otherwise would have been in existence, and had no reasonable alternatives concerning

same, as Defendants' product, for all practical purposes, is a necessity for, and of modern day

---

[1]  The following states have similar statutes or regulations.  Ala. Code §§ 8-31-1 - 8-31-6; A.C.A. § 4-88-301-4-88-305; Cal. Pen. Code § 396; Conn. Gen. Stat. § 42-230; D.C. Code § 28-4101 - 28-4102; Fla. Stat. Ann. § 501.160; Ga. Code Ann. § 10-1-393.4; Haw. Rev. Stat. § 209-9; Idaho Code § 48-603; Ill. Admin. Code tit. 14, §§ 465.10 - 465.30; Ind. Code §§ 4-6-9.1-1 - 4-6-9.1-7; 61 IAC 31.1(714); K.S.A. § 50-6, 106; Ky. Rev. Stat. Ann. § 367.374; LA R.S. 29:732; Me. Rev. Stat. Ann. § 1105; Md. Reg. Code tit. 940 §3.18; Mich. Stat. Ann. § 445.903(z); Miss. Code Ann. § 75-24-25; 15 C.S.R. § 60-8.030; N.J.S.A. §§ 56:8-107 to 8:109; NY Gen Bus § 396-r; N.C. Gen. Stat. § 75-38; 15 OK St. §§ 777.1 - 777.5; S.C. Code Ann. § 39-5-145; Tenn Code Ann. §§ 47-18-5101 - 47-18-5104; Tex. Bus & Com. Code § 17.46(b)(27); and Va. Code §§ 59.1-525 et seq; W.V. Code § 46A.

life.

65.     Defendants intended for Plaintiffs and the Class to purchase Defendants' gasoline in reliance upon Defendants' deceptive acts and/or practices in the marketing and sale of their gas.

66.     Defendants' deceptive acts and/or practices were committed with wilful and wanton injury to consumers, namely Plaintiffs and the Class.

67.     Defendants' deceptive acts and/or practices violate the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/2, and the Uniform Deceptive Trade Practices Act, 815 ILCS §510/2, or, alternatively, violate said statutes and the similar statutes of the various states where purchases of Defendants' gasoline were made.

68.     As a direct and proximate result of Defendants' deceptive conduct and concealments in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/2, and the Uniform Deceptive Trade Practices Act, 815 ILCS §510/2, or alternatively, in violation of the consumer fraud and deceptive business practice acts of the various states where purchases of Defendants' gasoline were made, Plaintiffs and the Class have suffered damages in an amount to be proven at trial, including all compensatory damages, punitive damages, attorneys' fees and costs.

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor and against Defendants as follows:

A.     Ordering that this action be maintained as a class action pursuant to F.R.C.P., Rule 23 and that Plaintiffs be appointed class representatives and Plaintiffs' counsel be appointed Class Counsel.

B.     Awarding Plaintiffs and Class Members compensatory damages, punitive

damages, prejudgment interest, costs of suit and attorneys' fees.

## COUNT II

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS  PRACTICES ACT

## (ILLINOIS)

### (Unfair Practices)

69.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 68 as if fully set forth herein.

70.     This Count is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"), on behalf of all people who purchased Defendants' gasoline in the State of Illinois, or alternatively under the ICFA and similar state acts on behalf of all people who purchased gasoline in the various states where purchases of Defendants' gasoline were made, during the class period.

71.     Defendants' conduct, individually and in concert as alleged above and herein is unfair in violation of said statutes in that their conduct offends public policy, is immoral, unethical, oppressive, unjust, unconscionable and unscrupulous, and caused and continues to cause substantial economic injury to Plaintiffs and the Class.

72.     The Defendants' conduct is driven by greed, profiteering and conspiracy to strip the marketplace of the economies of supply and demand and to maintain artificially inflated prices for gasoline to the damage and detriment of Plaintiffs and the Class as alleged herein.

73.     The Defendants have each unscrupulously gouged Plaintiffs and the Class by causing gasoline prices at the pump of their respective agents' gasoline stations to be artificially inflated in unprecedented proportions, as set forth in more detail above (*e.g.,* ¶¶ 1-6, 12-35), throughout the class period and inclusive of the aftermath of emergencies prompting increases in

the price of crude oil such as Hurricane Katrina, which, as intended by each of the Defendants, have lifted the Defendants' bottom-line profits to new heights.

74.     The Defendants, both individually and through their collective and concerted conduct, have oppressively imposed their price increases on Plaintiffs and the Class, who often had no meaningful choice but to refill their gasoline tanks from one of the Defendants' gasoline stations.

75.     The Defendants' tripling of their historic profit margins for refining crude into gasoline, *e.g.,* in the wake of Hurricane Katrina, is immoral, unethical, unconscionable and unscrupulous.

76.     Illinois consumer protection regulations setting forth the state public policy of ensuring fair, reasonable, affordable gasoline prices, and which implement the Illinois Consumer Fraud and Deceptive Business Practices Act, state that unconscionably high gasoline prices during market emergencies such as an act of war or natural disaster is an unfair practice. Ill. Adm. Code. 14B II. §§ 465.10, 465.20.

77.     Said regulations define a gasoline price as unconscionably high, if "the amount charged represents a gross disparity between the price of the petroleum product" and "the price at which the same product was sold or offered for sale...immediately prior to the onset of the market emergency," and if "the disparity is not substantially attributable to increased prices...or increased costs due to an abnormal market disruption."  Ill. Adm. Code. 14B II. § 465.30.

78.     Similar statutes or regulations promulgating consumer protection statutes and setting forth similar public policies in several Illinois sister states consider unconscionably high gasoline prices during market emergencies such as an act of war or natural disaster to be an

unfair or deceptive practice.[2]

79.     The Defendants' individual and collective conduct during the class period offends said public policies.  During and in the months following Hurricane Katrina, as set forth above the Defendants caused gasoline prices to dramatically increase in grossly disparate proportions compared to the price of gasoline immediately prior to the onset of Hurricane Katrina or the resulting increase in the price of crude oil.  The reason for said increase was not "substantially attributable to increased prices...or increased costs due to an abnormal market disruption," but rather, was a result of the defendants' oppressive and  unconscionable practice of using weather conditions such as Hurricane Katrina and related crude oil market conditions as an excuse to exponentially boost their own profits – above and beyond increased costs due to the Hurricane and the market conditions.

80.     As a proximate result of the above-described unfair acts and practices which were intentionally perpetrated by each of the Defendants individually and in concert, with reckless disregard for the consequences on their customers, Plaintiffs and the Class were damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor and against Defendants as follows:

A.     Ordering that this action be maintained as a class action pursuant to F.R.C.P.,

---

[2]  The following states have similar statutes or regulations.  Ala. Code §§ 8-31-1 - 8-31-6; A.C.A. § 4-88-301-4-88-305; Cal. Pen. Code § 396; Conn. Gen. Stat. § 42-230; D.C. Code § 28-4101 - 28-4102; Fla. Stat. Ann. § 501.160; Ga. Code Ann. § 10-1-393.4; Haw. Rev. Stat. § 209-9; Idaho Code § 48-603; Ill. Admin. Code tit. 14, §§ 465.10 - 465.30; Ind. Code §§ 4-6-9.1-1 - 4-6-9.1-7; 61 IAC 31.1(714); K.S.A. § 50-6, 106; Ky. Rev. Stat. Ann. § 367.374; LA R.S. 29:732; Me. Rev. Stat. Ann. § 1105; Md. Reg. Code tit. 940 §3.18; Mich. Stat. Ann. § 445.903(z); Miss. Code Ann. § 75-24-25; 15 C.S.R. § 60-8.030; N.J.S.A. §§ 56:8-107 to 8:109; NY Gen Bus § 396-r; N.C. Gen. Stat. § 75-38; 15 OK St. §§ 777.1 - 777.5; S.C. Code Ann. § 39-5-145; Tenn Code Ann. §§ 47-18-5101 - 47-18-5104; Tex. Bus & Com. Code § 17.46(b)(27); and Va. Code §§ 59.1-525 et seq; W.V. Code § 46A.

Rule 23 and that Plaintiffs be appointed class representatives and Plaintiffs'

counsel be appointed Class Counsel.

B.      Awarding Plaintiffs and Class Members compensatory damages, punitive

damages, prejudgment interest, costs of suit and attorneys' fees.

## COUNT III

## UNJUST ENRICHMENT

81.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through

80 as if fully set forth herein.

82.     Plaintiffs bring this Count, which is rooted in fraud, unfair practices, and

violations of the ICFA, , on behalf of all people who purchased Defendants' gasoline in the State

of Illinois, or alternatively in the United States, during the class period.

83.     As stated with more particularity above, Defendants, throughout the class

period, individually and in concert carried out and concealed their scheme of illegally and

artificially restraining trade and increasing the price of gasoline to consumers by controlling their

inventory, production, exports, limiting supply, restricting purchase, zone pricing, deceptive and

unfair pricing and excessive mark up between gasoline and crude prices (as discussed in the

Article "Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by

the Katrina Boom," pp. 5-7, Donald A. Nichols, September 16, 2005).

84.     Defendants' practices resulted in Plaintiffs and the members of the Class paying

more than the fair value for gasoline purchased and in fact paying a price that resulted from price

gouging by Defendants.

85.     The monies paid by Plaintiffs and the Class Members for gasoline conferred

substantial benefits upon Defendants.  Defendants each knew of, accepted and unjustly retained

profits conferred upon them by Plaintiffs and the Class members, which, in justice and fairness, and as a matter of equity, should be refunded and paid back to Plaintiffs and the Class Members in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor and against Defendants as follows:

A.   Ordering that this action be maintained as a class action pursuant to F.R.C.P., Rule 23 and that Plaintiffs be appointed class representative and Plaintiffs' counsel be appointed Class Counsel.

B.   Awarding Plaintiffs and Class Members compensatory damages and punitive damages, or alternatively ordering the Defendants to disgorge an equitable share of their profits during the Class period, and awarding prejudgment interest, costs of suit and attorneys' fees.

## COUNT IV

## UNJUST ENRICHMENT

## (BREACH OF IMPLIED-CONTRACT IN FACT AND/OR IN LAW)

86.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-80 as if fully set forth herein, and to the extent applicable, bring this Count in the alternative to Count III.

87.   Plaintiffs bring this Count on behalf of all people who purchased Defendants' gasoline in the State of Illinois, or alternatively in the United States, during the class period.

88.   Plaintiffs and the Class filled their vehicles with the Defendants' gasoline, and implicitly agreed to purchase gasoline from each of the Defendants' gasoline stations, at the price that the Defendants caused to be posted at the pump and on the gasoline station signs and confirmed on their gasoline purchase receipts.

89.     Implicit in the Plaintiffs' and the Class members' purchases of the Defendants' gasoline at the pump is that the gasoline price reflects: a free market price unencumbered by the Defendants' control and oligopolistic constraints designed to artificially boost retail market prices of gasoline, each Defendants' compliance with applicable laws and regulations governing same (*see* ¶¶ 60-63, 76-79, *supra*), profits for gasoline refiners which are within the standard or reasonable range practiced in the industry for decades, and a price of gasoline proportionate to the component price of crude oil.

90.     Further, implicit in Plaintiffs' and the Class members' purchases of the Defendants' gasoline at the pump is that the gasoline price comports with the public policy prohibiting unconscionable and unfair or deceptive price gouging arising out of prices during market or national emergencies or disasters.

91.     As set forth in detail above, the prices charged by the Defendants to Plaintiffs and the Class for gasoline during the class period violate said public policies, and do not reflect the reasonable expectations that are part of the price composite.

92.     As a proximate result, Defendants breached their contracts implied in fact and/or in law with Plaintiffs and the Class for the purchase of the gasoline at the aforesaid prices.

93.     The monies paid by Plaintiffs and the Class Members for gasoline at the prices represented during the class period conferred substantial benefits upon each of the Defendants.  Defendants knew of the benefits conferred upon them by Plaintiffs and the Class Members and accepted and unjustly retained these benefits, which, in fairness and as a matter of equity, should be refunded to Plaintiffs and the Class Members in an amount to be proven at trial.

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor and against Defendants as follows:

A.   Ordering that this action be maintained as a class action pursuant to F.R.C.P., Rule 23 and that Plaintiffs be appointed class representatives and Plaintiffs' counsel be appointed Class Counsel.

B.   Awarding Plaintiffs and Class Members compensatory damages and/or restitution, prejudgment interest, costs of suit and attorneys' fees.

C.   Declaring the rights of the parties and finding that the Defendants each breached their respective contracts implied in fact and/or in law with Plaintiffs and the Class.

## COUNT V

## CIVIL CONSPIRACY

94.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

95.   Plaintiffs bring this count on behalf of all people in the State of Illinois, and alternatively in the United States, who, during the class period, purchased Defendants' gasoline at retail and have not resold Defendants' gasoline and who therefore incurred damages as a result of the Defendants' conspiracy as alleged herein.

96.   Plaintiffs and the Class purchased gasoline at the pump at the prices established by the Defendants, who, by and through, *inter alia,* their employees, agents, distributors, dealers, brokers and/or shared tanks and pipelines, combined and conspired to manipulate the price of gasoline during the class period beyond that which would have been established by a market free from the Defendants' oligopolistic behavior as alleged herein.

97.   In furtherance of the conspiracy, one or more of the Defendants with the participation of the other Defendants, committed consumer fraud and were unjustly enriched, all

as more fully set forth above.

98.     As more fully referenced herein, Defendants joined together to foster their own commercial gain and unlawful purpose by illegally and artificially restraining trade and increasing the price of gasoline to consumers by controlling their inventory, production, exports, limiting supply, restricting purchase, zone pricing, deceptive and unfair pricing, falsely advertising the scarceness of gasoline, and excessive mark up between gasoline and crude prices (as discussed in the Article "Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by the Katrina Boom," pp. 5-7, Donald A. Nichols, September 16, 2005).

99.     Plaintiffs and the members of the Class have sustained damages by the actions of Defendants.

WHEREFORE, Plaintiffs and the Class pray that the court enter judgment in their favor and against Defendants as follows:

A.      Ordering that this action be maintained as a class action pursuant to F.R.C.P., Rule 23 and that Plaintiffs be appointed class representatives and Plaintiffs' counsel be appointed Class Counsel.

B.      Awarding Plaintiffs and Class Members compensatory damages, punitive damages, prejudgment interest, costs of suit and attorneys' fees.

MICHAEL SIEGEL and REBECCA SIEGEL,
on behalf of themselves and all others similarly situated,

By:_____/s/ LARRY D. DRURY_____
Plaintiffs' Counsel

Larry D. Drury                          William J. Harte
LARRY D. DRURY, LTD.                    WILLIAM J. HARTE, LTD.
205 West Randolph                       111 West Washington
Suite 1430                              Suite 1100
Chicago, IL 60606                       Chicago, IL 60602
312/346-7950                            312/726-5015