**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SIEGEL and REBECCA SIEGEL, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 06 C 0035 |
| SHELL OIL COMPANY, a Delaware corporation, BP CORPORATION NORTH AMERICA, INC., an Indiana corporation, CITGO PETROLEUM CORPORATION, a Delaware corporation, MARATHON OIL COMPANY, an Ohio corporation, and EXXON MOBIL CORPORATION, a New Jersey corporation, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On December 1, 2005, Plaintiffs Michael and Rebecca Siegel filed in the Circuit Court of

Cook County, Illinois a purported nationwide class action complaint against Defendants Shell

Oil Company, BP Corporation North America, Inc., Citgo Petroleum Corporation, Marathon Oil

Company and Exxon Mobil Corporation (collectively, "Defendants").  Defendants removed the

case based on the grant of federal jurisdiction found in 28 U.S.C. §1332(d)(2) and then moved

jointly to dismiss the complaint.  The Court granted that motion without prejudice, finding that

many of Plaintiffs' averments of fraud failed to satisfy the heightened pleading requirements of

Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  (R. 74-1, Order of July 26, 2006.)

Plaintiffs since have filed an amended complaint, alleging, as they did in the original

complaint, (1) that Defendants are liable under the Illinois Consumer Fraud and Deceptive

Business Practices Act (the "Consumer Fraud Act"), 815 ILCS 505/1, *et. seq.*, and the Illinois common law doctrines of unjust enrichment and civil conspiracy, and (2) that Defendants are liable to the purported class under the consumer fraud statutes and common law of various other states. (R. 77-1, Am. Compl.) Defendants have moved to dismiss the amended complaint (the "Complaint"), arguing that Plaintiffs' averments of fraud still fail to satisfy Rule 9(b). Defendants also urge dismissal under Federal Rule Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), arguing that for various reasons the Complaint fails to state claims upon which relief can be granted. The Court grants Defendants' motion in part and denies it in part. As explained below, Plaintiffs have in large measure failed to satisfy Rule 9(b)'s heightened pleading standard, but their Complaint nonetheless states a claim for relief.

## BACKGROUND

### I. The Parties

Plaintiffs Michael and Rebecca Siegel are citizens of Illinois and residents of Cook County, Illinois who purchased gasoline from the various Defendants. (R. 77-1, Pl.'s Am. Compl. at ¶11.) Defendants Shell Oil Company ("Shell"), BP Corporation North America, Inc. ("BP"), Marathon Oil Company ("Marathon"), Exxon Mobil Corporation ("Exxon"), and Citgo Petroleum Corporation ("Citgo") are entities that use agents, employees, dealers, distributors, brokers, affiliates and/or subsidiaries to sell, market, advertise and distribute gasoline to consumers in the State of Illinois and throughout the United States. (*Id.* at ¶¶12-16, 18.)

### II. Factual Allegations

The Complaint alleges the following facts. Defendants dominate the market for gasoline in the United States and control a substantial portion of the nation's gasoline supply. (*Id.* at

¶20.)  Defendants have used their market dominance in concert to increase the price of gasoline to consumers by (1) controlling inventory, production, and exports, (2) limiting supply, (3) restricting purchase, (4) using "zone pricing," (5) falsely advertising the scarceness of gasoline, and (6) excessively marking up the price between gasoline and crude oil prices – actions that have caused both the price and demand for gasoline to remain artificially high, and the supply artificially low.  (*Id.* at ¶¶1, 2, 23.)

In part, Defendants are able to create these artificial prices because they can gauge the current level of production by monitoring the crude oil sales and published reports of the volume of crude oil going into each refinery.  (*Id.* at ¶5.)  Because they share common storage tanks and pipeline schedules, each refiner can quickly determine the movement of gasoline, level of import or export, and existing inventory levels.  (*Id.*)  Defendants keep the level of gasoline inventories in storage tanks as low as possible to maximize price, but just high enough to avoid an unexpected disruption of flow into storage that "draws the inventory down."  (*Id.* at ¶25.)

Defendants also have used their market dominance to create constant increases and decreases in production (resulting in price spikes and "just-in-time inventories") and to "tread on national emergencies" by using events such as Hurricanes Katrina to artificially raise prices.  (*Id.* at ¶¶21, 22; *see also id.* at ¶25 (further alleging that "just-in-time inventories" is industry terminology for the practice of maintaining low levels of inventory).)  For example, during peak usage periods, Defendant Shell decreased production at its Bakersfield California refinery and, at times, was producing far less than the site's capacity.  (*Id.* at ¶3.)  Shell also announced plans to close the Bakersfield refinery, which has achieved "world-class performance" two years in a row and has the largest profits per gallon of any Shell refinery in the nation.  (*Id.*)  Amid protests that

the closure was intended to inflate gasoline prices by decreasing supply, the California Attorney General effectively forced Shell to find a buyer for the refinery, which is still in use today. (*Id.*) Shell employees have reportedly claimed that Shell lied and led people to believe that it limited refinery production or sought to close the refinery due to inadequate supply of crude oil, and internal Shell documents repeatedly show that operations at the refinery were running well and that Shell was capitalizing on high profit margins. (*Id.*)

Likewise, in August 2006, Defendant BP shut down half of the nation's largest oil filed/pipeline, which accounts for eight percent of U.S. oil output, after an inspection revealed a small pipeline leak. (*Id.* at ¶4.) By reducing supply, the shutdown increased gasoline prices and boosted Defendants' profits. (*Id.*) In addition, the pipeline shutdown was preventable, in that BP knowingly allowed the pipeline to corrode and leak, rather than reinvest in adequate maintenance. (*Id.*) The U.S. Department of Transportation has reported that it has not received a reasonable explanation of why BP had not cleaned the pipeline in years, noting that another Alaskan pipeline is cleaned every two weeks. (*Id.*) Several present and former BP employees have stated publicly that "they were told to cut back on maintenance of the pipeline and falsify records regarding same." (*Id.*)

As a result of such conduct, the gas industry has in recent years achieved record-high profits. In 1999, U.S. oil refiners made 22.8 cents per gallon of gasoline refined from crude oil. By 2004, they were making 40.8 cents for every gallon refined – a price that escalated even higher to 99 cents on each gallon sold in 2005. (*Id.* at ¶34; *see also id.* at ¶33 (further alleging that, since 1999, the average margin of refinery charges has increased by 85 percent while, in the previous seven years that margin increased by only 20 percent).) The increase in price per barrel

yielded profits to the gas industry of more than $25 billion in the July-September quarter of 2005, the quarter in which the price of crude oil hit $70.00 a barrel and gasoline surged to record levels after the disruption of Hurricanes Katrina and Rita. (*Id*. at ¶24.) On November 2, 2005, in response the release of these quarterly profits, Bill O'Reilly, host of *The O'Reilly Factor*, interviewed former Energy Secretary Bill Richardson. When asked, "[d]o you think that major oil companies price gouged the American public?" Richardson responded, "I do believe so, Bill. There's no correlation right now between $3 at the gasoline pump and the price per barrel in the international market. If it were $3, which it is now or close to it, it should be $90 per barrel on the international market and it's $65. So the economics don't work. I do believe that there's price gouging." (*Id.* (excerpting an additional exchange to the same effect).) Regarding Defendants specifically, (1) Shell reported earnings of $7.32 billion in the second quarter of 2006, up 40 percent from the previous year, (*id*. at ¶12); (2) BP recorded a 30 percent increase in profits to $7.3 billion in the second quarter of 2006 compared to the second quarter of 2005, (*id*. at ¶13); (3) Marathon's second quarter 2006 profits more than doubled due to strong gasoline prices and almost double refining margins, (*id*. at ¶14); and (4) Exxon's second quarter 2006 profits increased 36 percent to $10.36 billion, the second largest quarterly profit ever for a publicly traded company. (*Id*. at ¶15.)

In sum, beginning the first date that Defendants placed their gasoline into the stream of commerce and continuing through the present, Defendants, individually and jointly, have "engaged in misrepresentations, unlawful schemes and courses of conduct . . . that induced Plaintiffs and the Class to purchase gasoline . . . [by] illegally and artificially restraining trade and increasing the price of gasoline to consumers by controlling inventory . . ." and by "falsely

advertising the scarceness of gasoline and excessive mark up between gasoline and crude prices . . ." (*Id.* at ¶55 (quoting Nichols, Donald A., *Economic Outlook for Late 2005 and 2006, Strong Growth with a Bit of Inflation Fed by the Katrina Boom*).)  Further, Defendants intended for Plaintiffs to purchase Defendants' gasoline in reliance upon Defendants' unfair and/or deceptive acts in the marketing and sale of their gas.  (*Id.* at ¶65; *see also id.* at ¶¶17, 56 (further alleging that each of the Defendants caused artificially inflated gasoline prices to be listed and gasoline to be provided for sale to Plaintiffs at each of their agent's respective gas stations).) Plaintiffs have periodically purchased several gallons of gasoline in each of the Defendants' Chicago area gas stations at the artificially inflated prices advertised by the Defendants at the pumps and store signs of Defendants' gas stations.  (*Id.* at ¶56; *see also id.* at ¶57 (citing examples of Plaintiffs' gasoline purchases).)

## LEGAL STANDARD

### I.     Rule 8

"A complaint's ability to survive a Rule 12(b)(6) challenge inevitably turns on its ability to satisfy Rule 8 of the Federal Rules of Civil Procedure – the general rules of pleading a claim for relief."  *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005).  Under Rule 8, a "plaintiff's complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  Generally, a complaint satisfies the "short and plain statement" requirement if it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief."  *United States v. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003).  Rule 8, that is, does not require "an exhaustive recitation of the facts," *Lekas*, 405 F.3d at 606, and does not require a plaintiff "to identify, [or] plead specifically to,

each ingredient of a sound legal theory" – "[p]laintiffs need not plead facts; they need not plead law; they plead claims for relief." *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005); *Bennett v. Schmidt*, 153 F.3d 516, 518-19 (7th Cir. 1998) (complaints need not identify a legal theory to survive motion to dismiss). "Indeed, 'a complaint should be dismissed for failure to state a claim only if no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Lekas*, 405 F.3d at 606 (quoting *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (some internal punctuation omitted)); *Smith*, 429 F.3d at 708 ("A complaint suffices if any facts consistent with its allegations, and showing entitlement to prevail, could be established by affidavit or testimony at a trial."). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999).

## II.     Rule 9(b)

Rule 9(b) "effectively carves out an exception to the otherwise generally liberal pleading requirements under the Federal Rules." *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 992 (7th Cir. 1991); *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 782-83 (7th Cir. 1999) (Rule 9(b) contains "a special pleading requirement that contrasts significantly with the general standard enunciated in Rule 8"). Rule 9(b) provides that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The "circumstances constituting fraud" include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)

(internal quotation omitted); *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). In other words, Rule 9(b), where applicable, requires a plaintiff to plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

This heightened pleading standard applies to all "averments of fraud," Fed. R. Civ. P. 9(b), regardless of whether those averments pertain to a "cause of action" for fraud. *See Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 507 (7th Cir. 2007) ("Although claims of interference with economic advantage, interference with fiduciary relationship, and civil conspiracy are not by definition fraudulent torts, Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations."); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) ("Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not."); *see also Zurich Capital Markets, Inc. v. Coglianese*, No. 03 C 7960, 2005 WL 1950653, *10 n.12 (N.D. Ill. Aug. 12, 2005) ("to the extent that [plaintiff's] unjust enrichment claims rely on theories of fraud, its averments of fraud must comply with Rule 9(b)."). In addition, when an alleged claim includes allegations of both fraudulent and non-fraudulent conduct, Rule 9(b)'s heightened pleading standard applies only to allegations of fraud, and not to the complaint as a whole. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("in a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." (parentheses in original)); *see also Systems Am. v. Providential*

*Bancorp, Ltd.*, No. 05 C 2161, 2006 WL 463314, *12 (N.D. Ill. Feb. 24, 2006) (noting that, in a complaint that alleges both fraudulent and non-fraudulent conduct, Rule 9(b) applies only to allegations of fraud). When an averment of fraud fails to satisfy Rule 9(b), it must be stricken from the complaint. *See, e.g., Lone Star Ladies*, 238 F.3d at 368 ("The price of impermissible generality is that the averments will be disregarded.").

But because Rule 9(b) only excises deficient averments of fraud from a complaint (and does not provide an independent basis for dismissal), failure to satisfy Rule 9(b) does not necessarily sound a death knell. *Id.* ("Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated."); *see also Lachmund*, 191 F.3d at 782-83 (Rules 8 and 9 "were intended to be read not in isolation from each other but together"). Rather, Rule 9(b) has the practical effect of performing a gatekeeping function as to only certain types of claims. *See, e.g., Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) ("It [ ] remain[s] clear that ready access to the discovery engine . . . has been held back for certain types of claims. An allegation of fraud is one. Rule 9(b) demands a larger role for pleading in the pre-trial defining of such claims . . . Directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted." (emphasis original)). For instance, to proceed to trial on a claim that requires proof of an intentional fraudulent misrepresentation, a plaintiff must at the pleading stage describe with particularity the circumstances surrounding the intentional misrepresentation (*i.e.*, the "averment of fraud") – failure to do so warrants dismissal. *See, e.g., Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). But, in contrast, when claims do not *require* such proof, a complaint may survive a motion to dismiss if the remaining (non-fraud or non-deficient)

allegations satisfy Rule 8. *See Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) ("if both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b) . . ."); *Lone Star Ladies*, 238 F.3d at 368 (when complaint fails to satisfy Rule 9(b) and fraud is not an essential element, "[t]he proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated."); *Vess*, 317 F.3d at 1105 ("if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim."); *but see Venrock*, 348 F.3d at 593 ("if, while the statute or common law doctrine doesn't require proof of fraud, only a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge" (internal citation omitted)).

## ANALYSIS

## I. Certain Allegations in Plaintiffs' Complaint Fail to Satisfy Rule 9(b)'s Pleading Requirements

The Complaint contains several "averments of fraud" that do not meet Rule 9(b)'s heightened pleading standard. Because "Rule 9(b) is strictly construed [and] applies to fraud and mistake and nothing else," *Venrock*, 348 F.3d at 593, the first step in reaching this conclusion is to discern the extent to which allegations in the Complaint are "averments of fraud." Even though the word "fraud" does not appear in Plaintiffs' Complaint, that fact alone is not dispositive. *Id*. at 594 (noting in *dicta* that "the word 'fraud' need not appear in the complaint in order to trigger Rule 9(b)"). Instead, courts must evaluate whether allegations operate in effect as "averments of fraud." *See Rombach v. Chang*, 355 F.3d 164, 171 (2[d] Cir. 2004) ("By its

terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.") (citation omitted); *see also Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 794 (7th Cir. 2004); *In re General Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, *15-16 (E.D. Mich. Apr. 6, 2006); *cf. Veal v. First Am. Sav. Bank*, 914 F.2d 909, 912-13 (7th Cir. 1990) (applying Rule 9(b) to alleged violations of the Indiana Deceptive Practices Act, breach of fiduciary duty, and negligence because "the facts alleged in support of both counts would constitute fraud [ ] if proven"); *but see General Elec. Capital*, 128 F.3d at 1078-79.

In this regard, courts generally have held that the periphery of Rule 9(b) lies at the distinction between intentional fraudulent misrepresentations and negligent misrepresentations.[1] The difference between the two, of course, is the level of intent or *scienter. See, e.g., Fluke v.*

---

[1] The Seventh Circuit has held that Rule 9(b) applies to intentional fraudulent misrepresentations – *see, e.g., United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (the False Claims Act "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) . . ." because FCA claim requires proof of "three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false") – but not negligent misrepresentations. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) (Rule 9(b) does not apply to allegations of negligent misrepresentation); *Venrock*, 348 F.3d at 593 (same); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (Rule 9(b) applies "because the False Claims Act condemns fraud but not negligent errors or omissions."); *see also Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006) ("all allegations of deceptive conduct are generally subject to Federal Rule of Civil Procedure 9(b)"); *Equity Builders & Contractors, Inc. v. Russell*, 406 F. Supp. 2d 882, 888 n.4 (N.D. Ill. 2005) ("Claims for intentional misrepresentation must satisfy the requirements of Rule 9(b)."); *Systems Am.*, 2006 WL 463314 at *12 ("[e]ven where a plaintiff alleges that the defendant has made misrepresentations and material omissions, where he is not charging fraud, Rule 9(b) 'falls out of the picture'" (quoting *Venrock*, 348 F.3d at 593)).

*Heidrick & Struggles, Inc.*, No. Civ.A. 02-CV-8385, 2003 WL 22316772, *3 n.5 (E.D. Pa. Aug. 27, 2003) ("The only differences between intentional fraudulent misrepresentation and negligent misrepresentation are the state of mind of the person making the representation and the standard of proof that must be met by the plaintiff.").  Distinguishing deceptive misrepresentations based on the level of *scienter* makes sense in light of the policy behind Rule 9(b) – to protect a defendant's reputation from unnecessary harm – because allegations of *intentional* (but not negligent) misrepresentations suggest some measure of "moral turpitude."  *See Lachmund*, 191 F.3d at 783 (the "proper domain" of Rule 9(b) extends to "fraud" because fraud is "a matter implying some degree of moral turpitude and often involving a wide variety of potential conduct" (internal quotation omitted)); *Banta Corp. v. Honeywell Intern., Inc.*, No. 05-C-989, 2006 WL 801008, *1 (E.D. Wis. Mar., 24, 2006) ("I agree with the plaintiff that claims of *negligent* misrepresentation do not fall under Rule 9(b)'s governance . . . First, I note that the considerations underlying the Rule 9(b) particularity requirement . . . are largely absent when negligent misrepresentation is at issue.  For instance, whereas a fraud claim could sully the reputation of the defendant or be used for otherwise vexatious purposes, the same is not true of a negligent misrepresentation claim.  Also lacking in such a claim is the fraud requirement of *scienter*.  These differences suggest that a claim of negligent misrepresentation is only a pale simulacrum of a fraud claim, and it is therefore doubtful that such claims were intended to be covered under the Rule." (emphasis original)); *see also Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) ("The purpose . . . of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint.  Greater precomplaint investigation is warranted in fraud cases because public

charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual) . . . By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." (parentheses in original)); *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co*., 412 F.3d 745, 749 (7th Cir. 2005) (Rule 9(b) operates "to lift the cloud on [a defendant's] reputation" caused by "baseless claims of fraud" by "enabl[ing] the defendant to riposte swiftly and effectively if the claim is groundless").

Here, Plaintiffs' Complaint includes multiple "averments of fraud" that are subject to Rule 9(b)'s pleading requirements. Plaintiffs, for example, allege that Defendants intentionally misrepresented and misled Plaintiffs and the purported class to purchase gas at inflated prices:

- "Defendants used Hurricane Katrina as a false pretext for boosting prices at the pumps and their own profits, which they subsequently lowered, after the emergency, at a deliberately and artificially slow pace in order to pocket yet more profits." (R. 77-1, Am. Compl. at ¶31.)

- "Using increases such as the price of crude oil and Hurricane Katrina as a pretext, the Defendants have periodically caused the price of gasoline to increase dramatically but also to artificially drop back down much more slowly (*i.e*., in the aftermath of Katrina or when the price of crude drops), in order to pocket additional profits." (*Id.* at ¶32.)

- "Yet, the Defendants remained true to form and used the market increase in crude oil as an excuse to radically and disproportionally increase the price of refined gasoline and their own profits from refining crude into gasoline." (*Id.* at ¶35.)

- "Defendants' deceptive acts and/or practices were committed with wilful and wanton injury to consumers, namely Plaintiffs and the Class." (*Id.* at ¶66.)

- "The Defendants have each unscrupulously gouged Plaintiffs and the Class by causing gasoline prices at the pump of their respective agents' gasoline stations to be artificially inflated in unprecedented proportions . . . inclusive of the aftermath of emergencies prompting increases in the price of crude oil such as Hurricane

-13-

Katrina, which, as intended by each of the Defendants, have lifted the Defendants' bottom-line profits to new heights."  (*Id.* at ¶73.)

Each of these statements, and others in the Complaint, alleges that Defendants made intentional deceptive misrepresentations – *e.g.*, by "deliberately" or "unscrupulously" using Hurricane Katrina "as an excuse" or "false pretext" (*id.* ¶¶31, 32, 35, 63, 73), by "intend[ing] for Plaintiffs" to rely upon "deceptive acts," (*id.* at ¶65), by "wilfully" employing "deceptive acts" to inflict injury (*id.* at ¶66), by "conspiring" to "falsely advertise" (*id.* at ¶1), by lying to cover up profit margins (*id.* at ¶3), and by falsifying records to cover up the reasons for a pipeline shut down (*id.* at ¶4) – in order to artificially inflate the price of gasoline.  These allegations thus are effectively "averments of fraud" that are subject to Rule 9(b)'s heightened pleading requirement.

Plaintiffs, however, have not alleged any of the particulars surrounding these averments of fraud.  As to each, the Complaint wholly fails[2] to indicate one or more of the following:  (1) "the identity of the person making the misrepresentation" (the "who"),[3] (2) the "content of the misrepresentation" (the "what"), (3) "the time" the misrepresentation occurred (the "when"), (4) "the place" of the misrepresentation (the "where"), or (5) the "method by which the misrepresentation was communicated to the plaintiff" (the "how").  *Sears*, 912 F.2d at 893 (rejecting complaint that "lumped together" multiple defendants because the complaint was

---

[2]       The Court must look to the Complaint as a whole in determining whether Plaintiffs satisfied Rule 9(b).  *See Fidelity Nat'l Title Ins*, 412 F.3d at 749 ("The particulars of the charge of fraud would be easier to grasp if the acts, the times, the concealment, and a single defendant were placed in a single paragraph.  But as long as those data are somewhere in the complaint . . . Rule 9(b) is satisfied.").

[3]       As the above excerpts reflect, Plaintiffs' Complaint, with rare exception (*see id.* at ¶¶3, 4), fails to identify *the particular* Defendant who made the alleged misrepresentations at issue.

"bereft of any detail concerning who was involved in each allegedly fraudulent activity"); *see also Vicom*, 20 F.3d at 778 ("in a case involving multiple defendants, such as the one before us, the complaint should inform each defendant of the nature of his alleged participation in the fraud" (internal quotation omitted)).  Plaintiffs' faint sketch of fraud is insufficient.  These allegations are stricken from the Complaint without prejudice.

## II.    Plaintiffs' Complaint States a Claim for Relief

### A.    The Complaint's Remaining Allegations Satisfy Rule 8

Nonetheless, Plaintiffs' Complaint states a claim for relief under the Consumer Fraud Act and for unjust enrichment.[4]  The Consumer Fraud Act prohibits both "unfair" and "deceptive" practices, but neither claim *requires* proof of an intentional misrepresentation.[5]  Nor does unjust

---

[4]    Defendants also urge dismissal on account of purported deficiencies in the scope of the purported class, such as Plaintiffs ability to represent the claims of non-Illinois residents under the Illinois Consumer Fraud Act.  This is a "standing" argument, but it is an argument that pertains to standing under Fed. R. Civ. P. 23, not standing in the Article III sense.  *See* 1 NEWBERG ON CLASS ACTIONS § 1:2 n.11 ("Individual case or controversy standing is distinct from and narrower than common issues and typicality of claims tests under Rule 23.").  Because Defendants' argument does not challenge the Court's jurisdiction, the Court declines to address the argument at this juncture and will instead address it on Plaintiff's motion for class certification.  *See also Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1023 (C.D. Cal. 2005) ("Defendants assert that . . . [plaintiffs] have no standing to assert claims on behalf of shareholders of other funds.  [Plaintiffs] respond by asserting that Defendants essentially are arguing that they should not be certified as class representatives, an issue that is premature and irrelevant for purposes of a motion to dismiss.  According to [plaintiffs], the only relevant issue at the pleadings stage is Article III standing, not whether the they are proper class representatives under Rule 23.  The Court agrees.").

[5]    A claim for "deceptive" business practices under the Consumer Fraud Act does not require proof of intent to deceive or proof of an intentional misrepresentation.  *See Capiccioni v. Brennan Naperville, Inc*., 339 Ill. App. 3d 927, 933, 791 N.E.2d 553, 558, 274 Ill. Dec. 461, 466 (2ᵈ Dist. 2003) ("defendant need not have intended to deceive the plaintiff; innocent misrepresentations or omissions intended to induce the plaintiff's reliance are actionable under the statute"); *Grove v. Huffman*, 262 Ill. App. 3d 531, 536, 199 Ill. Dec. 830, 834, 634 N.E.2d 1184, 1188 (4th Dist. 1994) ("Courts of this State have consistently held that the

enrichment. *See, e.g., Firemen's Annuity and Benefit Fund of City of Chicago v. Municipal Employees', Officers', and Officials' Annuity and Ben. Fund of Chicago*, 219 Ill. App. 3d 707, 713, 162 Ill. Dec. 189, 193, 579 N.E.2d 1003, 1007 (1st Dist. 1991) (an action in equity for unjust enrichment requires a showing that "the defendant unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience. The cause of action based on unjust enrichment, however, does not require fault or illegality on the part of the defendant" (internal citation omitted)).

Plaintiffs' Complaint states claims for relief under any of these theories because facts consistent with the remaining allegations could yield liability. In short, the remaining allegations assert, among other things, that Defendants (1) controlled the nation's gasoline supply (R. 77-1, Pl.'s Am. Compl. at ¶¶1, 2, 23), (2) purposefully limited that supply by maintaining low inventory levels (*id.* at ¶25), (3) decreased production both during peak usage periods and distribution disruptions, (*id.* at ¶¶21, 22, 25), thereby achieving larger profits than they would have otherwise achieved. Based on theses allegations, the Court cannot conclude "beyond doubt

_____

[Consumer Fraud Act] applies to innocent misrepresentations."); *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill. App. 3d 1032, 1039, 171 Ill. Dec. 835, 841, 594 N.E.2d 1355, 1361 (2d Dist. 1992) ("The Consumer Fraud Act eliminated the requirement of *scienter*, and innocent misrepresentations are actionable as statutory fraud."); *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483, 495, 57 Ill. Dec. 904, 914, 429 N.E.2d 1267, 1277 (1st Dist. 1981); *see also Chow v. Aegis Mortg. Corp.*, 286 F. Supp. 2d 956, 963 (N.D. Ill. 2003) ("To satisfy the [Consumer Fraud Act's] intent requirement, plaintiff need not show that defendant intended to deceive the plaintiff, but only that the defendant intended the plaintiff to rely on the (intentionally or unintentionally) deceptive information given" (citing *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 242 Ill. Dec. 326, 721 N.E.2d 605, 614 (1999)) (parentheses in original)). The same is true for claims of "unfair" conduct. *See generally Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417-18, 266 Ill. Dec. 879, 888-89, 775 N.E.2d 951, 961 (2002) (three factors are relevant to determining whether an act is unfair: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.").

that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[6]  *Centers v. Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)).  Put differently, facts consistent with these allegations could establish that Defendants unjustly enriched themselves or acted deceptively or unfairly.[7]  *See, e.g., Rockford Memorial Hosp. v. Havrilesko*, 368 Ill. App. 3d 115,

---

[6]     In several instances, Defendants support their arguments for dismissal by citing Illinois cases that address whether state court complaints had adequately pleaded claims under Illinois' more rigorous fact-pleading standard.  (R. 82-1, Defs.' Motion at 11-14.)  Each cited case takes issue with a state court plaintiff's failure to plead a particular element.  (*See, e.g., id.* at 11 (citing Illinois state cases and arguing that Plaintiffs' Complaint should be dismissed for failure to plead a "deception" or "proximate cause").)  These cases are inapposite.  "[T]his suit is in federal rather than state court . . . . [and] [w]hen state and federal practice differ, federal rules adopted under the Rules Enabling Act prevail.  This means, in particular, that when federal courts entertain claims under state law . . . it is not necessary to plead facts matching elements of legal theories."  *Christensen v. County of Boone, Illinois*, __ F.3d __, 2007 WL 841097, *8-9 (7th Cir. Mar. 21, 2007); *see also AXA Corporate Solutions v. Underwriters Reinsurance Corp.*, 347 F.3d 272, 277 (7th Cir. 2003) ("Parties might prefer the notice-pleading regime of the Federal Rules of Civil Procedure over the fact-pleading approach that prevails in Illinois courts, but no one thinks that the Illinois rules of pleading are binding on the federal courts.").

[7]     The Court is mindful that Ill. Admin Code tit. 14, §465.30 describes situations in which the sale of "petroleum products" constitutes an unfair or deceptive act or practice:

(a) It shall be an unfair or deceptive act or practice, during any market emergency, for any petroleum-related business to sell or offer to sell any petroleum product for an amount that represents an unconscionably high price.

(b) A price is unconscionably high if:

(1) the amount charged represents a gross disparity between the price of the petroleum product and:

(A) the price at which the same product was sold or offered for sale by the petroleum-related business in the usual course of business immediately prior to the onset of the market emergency, or

(B) the price at which the same or similar petroleum product is readily obtainable by other buyers in the trade area; and

124-25, 306 Ill. Dec. 611, 619-20, 858 N.E.2d 56, 64-65 (2$^d$ Dist. 2006) (unconscionably high prices are actionable as an "unfair" practice if a plaintiff can further prove that the defendant's conduct "violate[s] public policy, [is] so oppressive that it leaves the consumer with little alternative except to submit to it, and injure[s] the consumer."); *Crichton v. Golden Rule Ins. Co.*, 358 Ill. App. 3d 1137, 1146, 295 Ill. Dec. 393, 402, 832 N.E.2d 843, 852 (5th Dist. 2005) (same); *Clark v. TAP Pharm. Prods., Inc.*, 343 Ill. App. 3d 538, 550, 798 N.E.2d 123, 133 (5th Dist. 2003) (affirming class certification where plaintiffs alleged that artificial price inflation constituted unjust enrichment and deceptive conduct under the Consumer Fraud Act); *cf. Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 267 Ill. Dec. 14, 776 N.E.2d 151 (2002). The remaining allegations in Plaintiffs' Complaint thus state a claim for relief under Rule 8.[8]

---

(2) the disparity is not substantially attributable to increased prices charged by the petroleum-related business suppliers or increased costs due to an abnormal market disruption.

The Court, however, declines to address at this stage whether or to what extent this administrative code section impacts the merits of this case because the parties have not yet fully briefed this issue and because it is not essential to resolving Defendants' Motion.

[8]       In addition, Defendants urge dismissal of Plaintiffs' "unfair" practices claim because:  (1) it fails to "allege that Defendants' purported supply management and pricing practices . . . violate any established statute or common law doctrine that would offend public policy," (R. 82-1, Defs.' Motion at 13 (internal quotation omitted)); (2) it "contains no allegations demonstrating that Defendants' challenged practices imposed a lack of meaningful choice or an unreasonable burden on the consumer that might satisfy the second unfairness element of immoral, unethical, oppressive, or unscrupulous conduct," (*id.* at 14 (internal quotation omitted)); and (3) "Plaintiffs do not adequately plead a substantial injury to consumers," (*id.*).  As the Court explained in its previous Order, Rule 9(b) provides only a limited exception to Rule 8's notice pleading standard by requiring Plaintiffs to *plead the circumstances* underlying "averments of fraud" with particularity.  *See Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir. 1993) ("Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent."); *see also Lachmund,* 191 F.3d at 783 ("By its terms, Rule 9(b)'s particularity

**B.      Defendants Have Not Established That Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law**

Defendants further argue that Plaintiffs' gas purchases constitute "contracts" that bar a claim for unjust enrichment. Illinois courts have held that "where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604, 296 Ill. Dec. 930, 953, 836 N.E.2d 681, 704 (1st Dist. 2005) (internal quotation omitted); *see also Nesby v. Country Mut. Ins. Co.*, 346 Ill. App. 3d 564, 566-67, 281 Ill. Dec. 873, 805 N.E.2d 241 (2004) (explaining that the rule exists because "[t]he theory of unjust enrichment is an equitable remedy based upon a contract implied in law," a cause of action for "unjust enrichment is only available when there is no adequate remedy at law"). But what is not clear from Defendants' Motion is whether a "contract" for the sale of gas *governs the parties relationship* such that applying the cited rule would be appropriate here. Indeed, unlike the facts at issue in Defendants' cited authority, the "contracts" alleged in the Complaint are consumer sales transactions, without written agreement and, aside

---

requirement applies only to allegations of fraud . . . [t]herefore we must take care not to permit the more demanding standard of Rule 9(b) to encroach unduly on the general approach to pleading that Congress has established in Rule 8."). Accordingly, Rule 9(b) does not impose on Plaintiffs the added burden of *pleading law* or *pleading the ingredients of a sound legal theory*, such as the elements of Plaintiffs' unfair practices claim. *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006) ("complaints . . . need not narrate events that correspond to each aspect of the applicable legal rule"); *see also Smith*, 429 F.3d at 708; *Bartholet A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (a "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal"). Because neither Rule 9(b) nor Rule 8(a) requires Plaintiffs to plead all the elements of claims (at least where fraud is not an essential element to that claim), the Court rejects Defendants' contention that the Plaintiffs' complaint is insufficient for those reasons. *See also Kolupa*, 438 F.3d at 714-15 (any defendant "tempted to write 'this complaint is deficient because it does not contain . . .' should stop and think: What rule of law *requires* a complaint to contain that allegation?' . . . [Accordingly], [a]ny decision declaring 'this complaint is deficient because it does not allege X' is a candidate for summary reversal, unless X is on the list in Fed. R. Civ. P. 9(b)." (internal citation and quotation omitted; emphasis in original)).

from price, without other terms. *Murray v. Abt Associates, Inc.*, 18 F.3d 1376, 1379 (7th Cir. 1994) (cited by Defendants and holding that no cause of action for unjust enrichment existed where "[t]wo real contracts apply: the Proposed Term Sheet and the contract of employment between Murray and Abt"); *La Throp v. Bell Federal Sav. & Loan Ass'n*, 68 Ill. 2d 375, 390, 12 Ill. Dec. 565, 572, 370 N.E.2d 188, 195 (1977) (cited by Defendants and holding that mortgage contract barred unjust enrichment). Defendants have failed to establish that the policy behind the rule requires its application on these facts.[9]

## III.    Plaintiffs' Claims Under the Consumer Fraud Act Are Not Barred

Defendants argue, in the alternative, that Plaintiffs' Complaint fails because Plaintiffs allegedly cannot bring an antitrust theory under other legal theories. Defendants contend that Plaintiffs cannot bring their alleged claim under the Consumer Fraud Act in light of the Illinois Supreme Court's decision in *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 140 Ill. Dec. 861, 550 N.E.2d 986 (1990). The Court disagrees.

In *Laughlin*, the Illinois Supreme Court considered whether plaintiffs, various third-party health insurance payors, could pursue an action under the Consumer Fraud for a hospital's "price discrimination"[10] where the Illinois antitrust statute (unlike its federal counterpart) specifically excluded price discrimination from its scope. *Id.* at 381 (the Illinois Antitrust Act adopts the

---

[9]    The Court further notes that the Illinois Commercial Code, which governs sales contracts, expressly states its provisions do not prohibit claims for unjust enrichment. 810 ILCS 5/1-103 ("Unless displaced by the particular provisions of this [Illinois Commercial Code], the principles of law and equity, including . . . unjust enrichment . . . shall supplement its provisions.").

[10]    The defendant hospital and one particular third-party payor had a contract that provided refunds to the payor under certain circumstances. The other third-party payors did not have a refund provision in their contracts with the defendant hospital. *Id.* at 378.

Sherman Act, but contains no counterpart to the Clayton Act or its Robinson-Patman

amendments).[11]  The court held that the Consumer Fraud Act could not afford plaintiffs relief:

> The defendants . . . argue that the Consumer Fraud Act was not intended as an additional enforcement mechanism of the antitrust legislation . . .  The defendants say that the dominating legislative intention was to protect consumers and others against various species of fraud and deceit.  The defendants have the correct understanding of the Consumer Fraud Act's intendment.  There is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism.  The

---

[11]       The *Laughlin* court explained that the lack of a counterpart was deliberate:

The Clayton Act and its Robinson-Patman amendments specifically prohibiting price discrimination were enacted specifically because the Sherman Act and other preexisting antitrust statutes did not cover such practices. . . .  Section 3 of the Illinois act closely follows section 1 of the Sherman Act, and section 11 provides for the use of Federal precedent in interpreting the language of our statute.  Based on this construction, one readily concludes that our legislature intended that an allegation of price discrimination alone would not be actionable under section 3(2).  The committee comments to the Illinois act are supportive of our holding:

> "[I]t was not considered wise to incorporate all features of the comparable federal legislation. S.B. 116 is similar to the federal Sherman Act of 1890 and to some of the contemporary legislation of the several states. It was not deemed necessary or desirable to include measures comparable to the several substantive antitrust sections of the Clayton Act of 1914." (Ill. Ann. Stat., ch. 38, par. 60-1 et seq., Commentary on the 1967 Illinois Antitrust Act, at 441 (Smith-Hurd 1977).)

*See also People ex rel. Scott v. Schwulst Building Center, Inc*. (1982), 89 Ill.2d 365, 369, 59 Ill.Dec. 911, 432 N.E.2d 855, and Curtis & Decker, The 1969 Amendments to the Illinois Antitrust Act, 58 Ill.B.J. 698, 700-01 (1970), in which the authors note:

> "[T]he act cover[s] the subject matter of the Sherman Act and contains no provision comparable to those of Sec. 2 of the Clayton Act.  The omission of provisions going beyond the traditional areas of restraint of trade and monopoly and into the realms inhabited by the incipiency doctrine embodied in the Clayton Act was based on careful consideration of State law experience, State and local needs, the type and frequency of complaints received and what might realistically be expected of state enforcement."

*Id.* at 386, 140 Ill. Dec. at 866, 550 N.E.2d at 991.

language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others. The title of the Act is consistent with its content. The Consumer Fraud Act states it was enacted to "protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices." Further indication that this is a statute directed against fraud and not one designed to be an additional antitrust enforcement mechanism is that every one of the specifically prohibited acts set out in the Act describes a situation where a buyer is being harmed by overreaching or fraudulent conduct . . . .

*     *     *

It is significant too that interpreting the Consumer Fraud Act as the plaintiffs urge would not only conflict with the intendment of the Act itself, but would also conflict with what we have decided on this appeal was the legislative intention regarding prohibitions against Robinson-Patman-type activities. As discussed above, the legislature in the Antitrust Act declined to include provisions against price discrimination because the legislature found that inclusion of such prohibitions would be undesirable. To construe the Consumer Fraud Act to give a cause of action for discriminatory pricing that the legislature refused to give under the Antitrust Act would be incongruous. Legislation is designed to be consistent. It would be inconsistent to provide that the very conduct which is not sufficient to state a cause of action under the Antitrust Act is sufficient to state a cause of action under the Consumer Fraud Act.

*Laughlin*, 133 Ill.2d 374, 389, 140 Ill. Dec. 861, 867-68, 550 N.E.2d 986, 992-93 (1990). The

upshot of *Laughlin* – a case that involved market competitors and not consumers – is that a

plaintiff may not use the Consumer Fraud Act when doing so would be *inconsistent* with the

legislative intent manifested in the Illinois Antitrust Act.[12] *Laughlin*, that is, holds that if a

---

[12]     Defendants point out that an intermediate state appellate court has interpreted *Laughlin*'s holding to mean something broader than the Court's reading here, that a complaint alleging an antitrust violation must be brought under the Illinois Antitrust Act rather than the Illinois Consumer Fraud Act:

In the case *sub judice*, . . . plaintiff's claims as classic antitrust allegations dressed in Consumer Fraud Act clothing. Our review of both the original complaint and the proffered amended complaint reveals that they repeatedly charge defendants with agreeing and conspiring to "fix," "maintain," or "stabilize" the price of potash. Such allegations are a classic example of price-fixing first outlawed by Congress over 100 years ago under section 1 of the Sherman Act, and by definition are covered by the Antitrust Act which is patterned on the Sherman Act. Thus, such allegations, pursuant to

plaintiff's claim falls within the federal antitrust statutes, but not the Illinois antitrust statute

(*e.g.*, a Robinson-Patman-type claim), then a plaintiff cannot pursue that claim under the

Consumer Fraud Act because doing so would constitute an end run around the legislature's

express determination that such conduct is not improper. *Laughlin*, however, is silent as to the

situation here: whether consumers can elect to pursue a remedy under the Consumer Fraud Act

where the Illinois Antitrust Act may *also provide relief*. As a result, Defendants have not

established that *Laughlin* prohibits Plaintiffs' claim for concerted, artificial price inflation under

the Consumer Fraud Act.

## IV. The Voluntary Payment Does Not Provide a Basis for Dismissal at This Stage of the Litigation

Defendants next contend that dismissal is appropriate because the voluntary payment

doctrine bars Plaintiffs' asserted claim. Generally stated, the voluntary payment doctrine is the

"rule [ ] that in the absence of fraud, misrepresentation, or mistake of fact money voluntarily

paid under a claim of right to the payment, with full knowledge of the facts by the person making

the payment, cannot be recovered unless the payment was made under circumstances amounting

---

*Laughlin*, must be brought under the Antitrust Act and not the Consumer Fraud Act. Therefore, we find plaintiff's complaint failed to state a cause of action under the Consumer Fraud Act.

*Gaebler v. New Mexico Potash Corp.*, 285 Ill. App. 3d 542, 544, 221 Ill. Dec.707, 709, 676 N.E.2d 228, 230 (1st Dist. 1996) (internal quotation, citation, and certain punctuation omitted). No other Illinois appellate court has adopted such a broad view of *Laughlin*'s holding but, in any event, the critical inquiry in determining the content of state law is what the state supreme court has said about the issue. *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) ("the task of the federal court sitting in diversity is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now" and further noting that it is "*in the absence of prevailing authority from the state's highest court*, [that] federal courts ought to give great weight to the holdings of the state's intermediate appellate courts" (emphasis added)).

to compulsion." *King v. First Capital Financial Servs. Corp.*, 215 Ill.2d 1, 30, 293 Ill. Dec. 657, 673, 828 N.E.2d 1155, 1171 (2005) (internal quotation omitted). "The voluntary-payment doctrine applies to any cause of action which seeks to recover a payment on a claim of right, whether that claim is premised on a contractual relationship or a statutory obligation . . ." *Harris v. ChartOne*, 362 Ill. App. 3d 878, 881, 299 Ill. Dec. 296, 299, 841 N.E.2d 1028, 1031 (5th Dist. 2005) (citing *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 855 n.7, 213 Ill. Dec. 304, 658 N.E.2d 1325 (1995)).

> The reason [for] the rule . . . and its propriety[ ] are quite obvious when applied to a case of payment on a mere demand of money unaccompanied with any power or authority to enforce such demand, except by a suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat with each other on equal terms, and if litigation is intended by the one of whom the money is demanded, it should precede payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence or under a reservation of the right to litigate the claim[ ] and afterward sue to recover the amount paid.

*Smith*, 276 Ill. App. 3d at 848, 213 Ill. Dec. 304, 658 N.E.2d 1325 (internal quotation omitted).

Defendants' argument that the voluntary payment doctrine warrants dismissal is unavailing. Affirmative defenses like the voluntary payment doctrine, *see Harris*, 362 Ill. App. 3d at 880, 299 Ill. Dec. at 299, 841 N.E.2d at 1031, will only merit dismissal of a complaint under Rule 12(b)(6) if the "allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense . . ." *Brengettcy v. Horton*, No. 01 C 0197, 2006 WL 1793570, *1 (N.D. Ill. May 5, 2006) (internal quotation omitted) (statute of limitations context); *see also United States v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (because "[a] complaint states a claim on which relief may be granted whether or not some defense is potentially available," a "complaint[] need not anticipate and attempt to plead around defenses"); *Indiana*

*Gas Co.*, 350 F.3d at 626 (same).  Here, nothing in Plaintiffs' Complaint expressly establishes that the voluntary payment doctrine applies.  Indeed, the remaining allegations in the Complaint pointedly assert to the contrary that, regarding Defendants' production and sale of gasoline, Plaintiffs were without "full knowledge of the facts" – an essential ingredient of the voluntary payment doctrine.  *See, e.g., Lee v. Allstate Life Ins. Co*., 361 Ill. App. 3d 970, 977, 297 Ill. Dec. 528, 535, 838 N.E.2d 15, 22 (5th Dist. 2005) (determining that the voluntary payment doctrine did not apply in part because "as plaintiffs allege that Allstate intentionally misinformed its agents and policyholders that the [cost of insurance] increase was going to pay taxes, it cannot assert that its policyholders had 'knowledge of the facts' regarding Allstate's actual goal of increasing profits.  Allstate's misrepresentations to its policyholders, implying that the monies from the [cost of insurance] increase were to be used to pay taxes rather than to increase profits, preclude the shield of the voluntary payment doctrine defense.").  Accordingly, Defendants' argument fails at this stage of the litigation.  *See Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998) (dismissal improper where nothing in the complaint "ruled out" the possibility of relief); *Smith*, 429 F.3d at 708 (dismissal under Rule 12(b)(6) inappropriate because "none of the complaint's allegations shows that [defendant] is sure to succeed").

**CONCLUSION**

The Court grants Defendants' Motion to Dismiss in part and denies it in part. As noted above, the Motion is granted to the extent that certain averments of fraud fail to meet Rule 9(b)'s heightened pleading standard. It is denied to the extent it sought dismissal under Rule 12(b)(6) for failure to state a claim for relief.

Dated: March 26, 2007                                             ENTERED

AMY J. ST. EVE
United States District Judge